AO 91 (Rev. 08/09) Criminal Complaint

FILED

JUN 26 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

3 - 15 - 7 0 8 1 7

| United States of America | ) | |
| v. | ) | Case No. |
| ULICES CAZAREZ | ) | SAN FRANCISCO VENUE |
| | ) | |
| | ) | LB |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 8, 2015 _____ in the county of _____ San Francisco _____ in the
_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
| --- | --- |
| Title 18, United States Code, Section 1958 | Use of interstate commerce facilities in the commission of murder-for-hire |
| | Maximum Pentalties:  10 years imprisonment; 3 years supervised release; $250,000 fine; $100 special assessment |

This criminal complaint is based on these facts:

See attached Affidavit of Bureau of Alcohol, Tobacco, Firearms and
Explosives Special Agent Kristen Larsen.

Approved As To Form

AUSA Stephen Meyer

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Kristen Larsen, Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____ Jun 26, 2015 _____

_____
_Judge's signature_

City and state: _____ San Francisco, California _____

Hon. Laurel Beeler, U.S. Magistrate Judge
_Printed name and title_

1 - MJJ 2

## AFFIDAVIT OF KRISTEN LARSEN

I, KRISTEN LARSEN, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, hereby depose and state that:

## I. INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since April 2013. I have participated in the execution of and have received training in, among other things, criminal arrests, criminal procedure, search and seizure, firearms and narcotics investigations, and the identification and investigation of organized gangs. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I respectfully submit this Affidavit in support of a Criminal Complaint charging Ulices CAZAREZ ("CAZAREZ") for violating Title 18, United States Code, Section 1958: use of interstate commerce facilities in the commission of murder-for hire.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for the arrest of CAZAREZ, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support the lawful arrest of an individual listed in this Affidavit.

4. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part only. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part only.

## II. PROBABLE CAUSE

5.   ATF is investigating CAZAREZ for seeking to hire someone to kill an unidentified woman. On June 11, 2015, I learned the following from meeting with a confidential informant (CI)[1] as well as other law enforcement officers:

    a.   The CI identified CAZAREZ as an individual interested in hiring someone to commit murder.

    b.   The CI stated he/she has been a business acquaintance of CAZAREZ for approximately 15 years, but there has been little contact between the CI and CAZAREZ over the last few years.

    c.   The CI identified CAZAREZ's cellular telephone number as 650-642-7929.

6.   A check of a public information database regularly utilized by law enforcement revealed that the phone number 650-642-7929 is serviced by Sprint and associated/ used by "Ulices Cazarez" with an address of 380 Larkspur Drive, East Palo Alto, CA 94303. As described below, this is the same address on the registration for the vehicle that CAZAREZ was driving on June 12, 2015.

7.   The following is a summary of communications between the CI and CAZAREZ from June 8 to June 11, 2015 (Pictures of text messages were taken for evidentiary purposes):

    a.   On June 8. 2015, CAZAREZ sent an outgoing text message from phone number 650-642-7929, asking the CI to call.

    b.   A short time later, the CI called CAZAREZ, CAZAREZ asked to meet with the CI in person, the CI responded that he/she was not available to meet.

    c.   Shortly after talking with CAZAREZ, the CI spoke to a mutual friend "Alex" LNU regarding CAZAREZ. The CI stated that Alex told him/her that CAZAREZ had $10,000 to hire someone to kill a woman causing CAZAREZ "personal problems."

    d.   On June 10. 2015, CAZAREZ called the CI twice, the CI did not answer either call.

    e.   On June 11. 2015, CAZAREZ sent another text message asking the CI to call.  The CI and CAZAREZ exchanged multiple text messages arranging a meeting.

---

[1] -2-

[1] The CI is currently cooperating with the ATF out of concern for the wellbeing of the unknown target of the murder-for-hire. Information provided by the CI to ATF has, to date, been found to be credible and much of it has been corroborated.  The CI has no criminal convictions that I am aware of, but has previous arrests for various offenses, including but not limited to, Conspiracy, Battery: Spouse, Possess of a Controlled Substance, Possess of a Controlled Substance for Sale, Driving While License Suspended, Inflict Corporal Injury Spouse/Cohabitant. The CI has no known drug abuse or mental issues.

8.   Shortly thereafter, the CI met with CAZAREZ. The CI stated that CAZAREZ wanted to "get rid of a bitch." The CI and CAZAREZ agreed to use the term "fix the car" when referring to the murder for hire. When the CI asked who the intended victim was, CAZAREZ said he had done an internet search trying to find a picture of her, but without success. The CI stated that CAZAREZ seemed desperate and very serious.

9.   On June 11, 2015, at my direction and in my presence, the CI contacted CAZAREZ via text message at 650-642-7929 to arrange a meeting between CAZAREZ and an ATF Undercover Agent, posing as a contract killer (the UC). CAZAREZ agreed to meet the next day (June 12, 2015) at 1200 hours. This conversation was documented by taking photographs of the text messages from the CI's phone.

10.   During subsequent text message exchanges on this date, CAZAREZ asked if he could "get the price to fix my car before I meet him." The CI responded with $6,000 to $7,000. CAZAREZ also sent a message stating, "Our other friend is also trying to help me find someone to fix my car ..." This conversation was again documented via photographs of the CI's phone.

11.   On June 12, 2015, law enforcement agents and officers, including myself, met with the CI at a pre-determined location in San Francisco, California. The CI and an ATF agent acting in an undercover capacity (the UC) then drove in the ATF agent's undercover vehicle, to a parking lot, located at 3201 20th Avenue, San Francisco, California. Law enforcement agents and officers conducted surveillance of the undercover vehicle at this location.

12.   While in the parking lot, the CI and CAZAREZ exchanged several text messages about the meeting location and CAZAREZ's whereabouts. The CI then received an incoming telephone call from CAZAREZ from telephone number 650-642-7929. During this telephone call, the CI described to CAZAREZ where the CI and the UC (posing as a hitman) were parked. This telephone call was recorded.

13.   A short time later, a vehicle matching CAZAREZ vehicle arrived in the parking lot. Law enforcement personnel assisting in surveillance verified the vehicle's California license plate, 3XJF066, which from previous query was known to be registered to CAZAREZ. I observed CAZAREZ exit his vehicle, approach the UC vehicle from the rear, and enter the rear passenger-side of the vehicle. The UC positively identified CAZAREZ from prior review of a California Department of Motor Vehicles photograph.

14.   The UC inquired if CAZAREZ had a "problem" that needed to be handled. CAZAREZ replied that he needed a "car fixed." The UC informed CAZAREZ that the UC could fix his problem for the

right price. The UC then inquired as to what price CAZAREZ had considered. CAZAREZ replied that what CAZAREZ had previously discussed with the CI would be agreeable. The UC confirmed that CAZAREZ meant "seven," referring to $7,000.00. The UC countered with a suggestion of $8,000.00 but stated that he could work with CAZAREZ as long as the UC could receive a portion of the money in advance. CAZAREZ inquired as to how much the UC wanted to receive in advance to which the UC replied a couple thousand dollars.

15. The UC explained that there was a difference in price for somebody to be "tuned up" and for a "bitch" to be "eliminated completely." CAZAREZ replied that he just wanted a "car fixed." The UC understood CAZAREZ to be attempting to use innocuous terms to conceal the true nature of the conversation. The UC replied that they needed to be clear about what they were discussing because there was no turning back after a decision was made and that if CAZAREZ was not sure about it or was having second thoughts that they could both go their separate ways and pretend like the meeting had never taken place. CAZAREZ replied, "No, no ... I ain't got no second thoughts about anything." The UC further explained that the UC wanted to make sure CAZAREZ was serious and that once CAZAREZ told the UC it was a "go," then CAZAREZ should assume that it would be done. CAZAREZ replied, "Alright."

16. The UC again informed CAZAREZ that the UC would like some money in advance so that the UC knew CAZAREZ was serious. The UC explained that the UC would do "homework" and he needed to know where he was going, what he was looking for, and he needed to learn patterns. CAZAREZ replied, "Alright." The CI then inquired if CAZAREZ had obtained an address of the intended victim. CAZAREZ replied negatively and stated that he should obtain it in about two days.

17. CAZAREZ then stated, "Let me talk to my friends and let me borrow the money." The UC again inquired about obtaining some money in advance. CAZAREZ stated that he was in the process of moving, but that CAZAREZ would contact the CI and advise the CI. CAZAREZ stated that he did not want the UC's telephone number and did not want to give out his telephone number. The UC replied that the UC preferred that the less people that needed to be involved, the better. The CI informed CAZAREZ that he/she did not want to be in the middle of the discussions.

18. The UC inquired as to how soon CAZAREZ was looking to fix his "problem," CAZAREZ replied, "Like soon."

19. The UC again informed CAZAREZ that the UC would need information on the front end so that the UC could figure out what car he was looking, if "she"' (the intended victim) lived with someone, and what the patterns were to which CAZAREZ replied, "I'll find out." CAZAREZ again stated that

CAZAREZ would be in contact with a "friend" and CAZAREZ would then contact the CI. The CI again explained that he/she did not want to be involved in the discussions.

20. At this time, CAZAREZ and the CI exited the ATF undercover vehicle and walked a short distance away. CAZAREZ informed the CI that CAZAREZ was worried because he knew of an associate who had previously been caught during a DEA arrest operation. The CI explained that the UC had been referred to the CI highly recommended. CAZAREZ explained that CAZAREZ was "paranoid like a motherfucker." The CI again explained that he/she did not want to be in the middle of the discussions. CAZAREZ explained that he was concerned that the UC may be working with law enforcement. The CI replied that he/she had known the UC for a while and that it was up to CAZAREZ how CAZAREZ wanted to proceed. CAZAREZ then stated that he would need to contact another individual to borrow some money. CAZAREZ again explained that he knew of an associate who had been arrested by DEA and CAZAREZ had reviewed the video footage from the sting operation. CAZAREZ further stated that he had wanted to ask the UC to lift the UC's shirt up (presumably to look for a transmitting device) because CAZAREZ was reminded of the previous sting operation. CAZAREZ then informed the CI that paying the UC was not the issue, it was that CAZAREZ was skeptical of meeting any individuals whom he did not know. CAZAREZ explained to the CI that CAZAREZ was putting something together up north and that CAZAREZ had hoped he could compensate the CI that way if the CI remained involved. (The CI later explained to the UC that he/she understood CAZAREZ to be referring to marijuana.) The CI again explained to CAZAREZ that the CI did not want to be involved. The CI further stated that what CAZAREZ was asking for was not an easy thing to ask for. CAZAREZ replied that he would talk to an associate about obtaining the money and that money was not the issue, that the issue was trust. Prior to departing, CAZAREZ advised that he would contact the CI at a later time.

21. Shortly thereafter, the meeting concluded and all parties departed the parking lot. This meeting was audio and video recorded.

22. Law enforcement personnel assisting in surveillance followed CAZAREZ on to Interstate 280. CAZAREZ appeared to be conducting counter surveillance maneuvers by repeatedly changing lanes, driving at varying speeds then abruptly exiting and stopping on the side of the road at Interstate 280, exit 22, Alpine Road. Shortly thereafter, surveillance was terminated.

23. On June 23, 2015, at my request, and in the presence of myself and other law enforcement officers, the CI contacted CAZAREZ by cellular telephone at 650-642-7929. This conversation was recorded.

24. During the telephone conversation CAZAREZ stated that he was "down south." The CI later informed me that "down south" is a reference to Mexico.

25. The CI asked CAZAREZ, "what's up with this lady?" to which CAZAREZ responded, "I don't know bro, I gotta find another way to fix my car." CAZAREZ stated multiple times that he has to get his "car fixed," because it is "all fucked up," and he has to get it fixed soon.

26. The CI inquired into the nature of "the problem," to which CAZAREZ responded that it is a "personal problem," and again said that he's "gotta get this fucking car fixed like immediately…"

27. The CI offered to find another hitman, to which CAZAREZ responded, "Don't worry about it…I'm gonna have to find a way to get this car fixed."

28. CAZAREZ stated, "I'm not gonna be around for a while. I'm gonna be leaving for Cuba for a while." CAZAREZ went on to tell the CI that he has a house in Havana and spent 8 months there last year. CAZAREZ stated, "I'm gonna be leaving pretty soon."

29. Shortly thereafter, the call was terminated.

### III. REQUEST TO SEAL THIS CRIMINAL COMPLAINT AND AFFIDAVIT

30. I believe that should the contents of this affidavit be made public, it would jeopardize this investigation and any personnel assigned to or cooperating in this investigation. Because this is an ongoing investigation, I respectfully request that the warrant and this affidavit be sealed until further order of the court.

## IV.  CONCLUSION

31. For the foregoing reasons, I respectfully submit that there is probable cause to believe that Ulices CAZAREZ has violated Title 18, United States Code, Section 1958: use of interstate commerce facilities in the commission of murder-for hire. Accordingly, I respectfully request that a warrant for the arrest of Ulices CAZAREZ be issued.

KRISTEN LARSEN
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Sworn to and subscribed before
me this 2-6 day of June, 2015.

HON. LAUREL BEELER
UNITED STATES MAGISTRATE JUDGE