KENNETH H. WINE(#142385)
Hallinan & Wine
345 Franklin Street
San Francisco, CA  94102
Telephone:  (415) 621-2400
Facsimile: (415) 575-9930
email: kenwine@hotmail.com

Counsel for ULICES CAZAREZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | CR- 15-362 CRB |
|---|---|---|
| Plaintiff, | ) | **SENTENCING MEMORANDUM OF DEFENDANT ULICES CAZAREZ** |
| v. | ) | |
| ULICES CAZAREZ, | ) | Date: February 22, 2017<br>Time: 10:00 a.m. |
| Defendant. | ) | HON. CHARLES R. BREYER |

**I.     Introduction**

On December 6, 2016, Defendant Ulices Cazarez plead guilty to a single count indictment of murder for hire, 18 U.S.C. §1958. The parties have entered into a plea agreement under FRCrP 11(c)(1)(A) and (B) which provides for a guideline calculation as follows: Total Adjusted Offense Level of 29, and no agreement on criminal history. The plea agreement also permits the defendant to argue for a downward variance based on the factors set forth in 18 U.S.C. § 3553(a). Given the Defendant has no criminal history points, his advisory guideline range is 87 to 108 months (or 7.25 to 9 years).

The probation officer has submitted a well-written Presentence Report, which details the somewhat unusual nature of the defendant and this case, and concludes that a downward variance to a sentence of 60 months is appropriate. The following will address the facts of this case, the background of the defendant, and reasons a variance is appropriate.

**II.    Argument**

With the advent of *U.S. v. Booker*, 125 U.S. 738 (2005), the Court was finally restored with the power to sentence as it sees fit within the statutory framework of 18 U.S.C. § 3553(a). The restoration of this power gives the Court real discretion to fashion a sentence *"sufficient but not greater than necessary"* to achieve the purpose of sentencing set forth in 18 U.S.C.§3553(a)(2) after considering:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [§3553(a)(1)];

(2) the need to reflect the seriousness of the offense, respect for the law, deterrence to criminal conduct, and protection of the public [§3553(a)(2)(A)-(C)]

(3) the kinds of sentences available [§3553(a)(3)];

(4) the advisory – but *non-mandatory* – Sentencing Guidelines [§3553(a)(4) and (a)(5)];

(5) the need to avoid unwarranted sentencing disparity among defendants with similar records and similar conduct [§3553(a)(6)]; and

(6) the need to provide restitution to any victim of the offense [§3553(a)(7)].

In this case, the Court must choose the minimally sufficient sentence to fulfill the purposes of sentencing based on a consideration of all §3553(a) factors. *Kimbrough v. U.S.*, 128 S.Ct. 558, 570 (2007). The Supreme Court has also rejected the notion that a sentence that amounts to a substantial variance from the Guidelines needs to be justified by extraordinary circumstances, holding instead that appellate courts must review all sentences, both within and without the Guidelines range, under a differential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 591 (2007).

Two subsequent Supreme Court decisions, *Spears v. United States*, 555 U.S. 261(2009) and *Nelson v. United States*, 555 U.S. 350 (2009), have reiterated that the Guidelines are now truly advisory and that there is no presumption at the district court level that a Guidelines sentence is inherently reasonable. As stated by the Seventh Circuit, "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier*, 49l F.3d 680, 685 (7th Cir.2007).

This is an unusual case with an unusual defendant. Mr. Cazarez rose from an extraordinarily tragic upbringing to a manager in the janitorial business, making a six figure income, and supervising hundreds of people throughout his decade long career. He was a doting, beloved single dad to twin daughters, whom he has loved and supported on his own since their mother abandoned them.

The victim in this case is one of his former employees who accused him of sexually harassing her in April of 2014. In May of 2015, she sued him in State court. What makes this case so unusual is the response by Mr. Cazarez to this lawsuit, that is, the degree to which the Mr. Cazarez's legal naivete, along with his mental illness and drug use, drove his actions.[1]

**A.    The Defendant's Life**

Mr. Cazarez was born in a small Mexican village. At the age of 5, his father died from either cancer or he was murdered. Because, to this day, no one in the family ever discussed the death

---

[1] The full details are set forth in Dr. Jess Ghannam's November 19, 2015 Forensic Report, submitted to the Court by Probation, which is incorporated herein by reference.

of his father, Mr. Cazarez believes he had cancer, while his sister, Marisol, believes their father was murdered. It was an incredibly traumatic experience for Mr. Cazarez. He would cope by crying for his father for days on end while sitting in a tree. Mr. Cazarez received no therapy or treatment of any kind, and never discussed his father's death. His father was simply forgotten.

Shortly thereafter, his mother left Mr. Cazarez and his sister, seeking a better life in the U.S. About a year later, Mr. Cazarez and Marisol came to the U.S. to live with their mother and her new husband. The stress of adjusting to life here was typically difficult. In was made much worse by their mother's intense physical abuse. Some of it Mr. Cazarez suffered, but mostly he sat by as a silent witness to his sister Marisol being savagely beaten and abused.[2] Despite witnessing the abuse of his beloved sister, Mr. Cazarez never intervened, and, until this case, never spoke to anyone about it. Moreover, Mr. Cazarez claimed to have received little physical abuse, yet he also remembers being hit with a vacuum cord. Once again, the family has never spoken about their mother's abuse.

Despite his childhood, Mr. Cazarez grew into a responsible adult. In 2006, he fell in love with the mother of his children, Maria, and they had twins. Maria began to physically abuse Mr. Cazarez, who eventually called the police shortly after the twins were born. Maria had "gouged" Mr. Cazarez's face. Maria was charged in San Mateo with Domestic Violence, voluntarily deported, and, until recently, made little or no attempt to contact her children. Mr. Cazarez was on his own.

For the next decade, Mr. Cazarez was, by all accounts, a well-adjusted single parent to his twin daughters. He was hard working, well respected by his employers, and got repeatedly promoted in the janitorial business.

That all changed in May of 2015. A year after having been accused at work of sexual harassment charges, Mr. Cazarez was approached by the victim while he was eating ice cream with his now 9 year old daughters. The victim told him that she would sue him, would take his house, and see to it his life was destroyed.

---

[2] A more detailed version of the abuse is detailed in Marisol's letter to the Court, attached as Exhibit A. Other letters of support are set forth as Exhibit B. Mr. Cazarez's efforts at rehabilitation while at Glenn Dyer Jail are attached as Exhibit C.

At this point, Mr. Cazarez's naivete becomes apparent. Instead of defending the civil case with an insurance provided lawyer like a normal person might do, Mr. Cazarez believed the victim would destroy his life. He had very little practical knowledge about his legal defense, that an attorney for the company would likely represent him for free, or even how to go about protecting himself. He panicked. He fell apart mentally. He stopped sleeping and began a rapid downward spiral into drugs and cognitive impairment. The details are set forth in Dr. Ghannam's report, and will not be repeated here. Needless to say, he began to seek out someone to kill his victim.

Dr. Ghannam suggests that two possible conclusion can be drawn from Mr. Cazarez's behavior. Either he suddenly became a willing accomplice to murder overnight, or he had some sort of mental disturbance, brought on by lack of sleep, excessive drug and alcohol abuse. The facts surrounding this event suggest the latter is much more likely.

First, when speaking with the undercover police officer, Mr. Cazarez claimed not to have the $8,000 the officer suggested as a price. In fact, Mr. Cazarez had $26,000 in the bank. Second, the officer wanted a name and address. Mr. Cazarez knew the name and address, but never provided them, to anyone, despite repeated requests. Third, over the next few weeks, Mr. Cazarez kept up a running dialogue via phone texts with another friend, in which he never named the victim.

While the texts he sends makes it is clear he is certainly contemplating the victim's murder, was seeking out a person to do it, and agreed to pay a price, Mr. Cazarez never provided the identifying information for the act to happen. We know this is true because at the time of his arrest, the police did not know who the intended victim was. Therefore, while the facts satisfy the statutory offense – intending a murder be committed, agreeing on a price, and using a facility of interstate commerce, Mr. Cazarez's commission of the crime was somewhat less certain than one might typically expect in a crime like this.

### III. Sentencing Options

In terms of sentencing, the PSR recommends a downward variance to 60 months. Given the § 3553(a) factors previously discussed, this is too much time. A more appropriate sentence in the

range of 48 months would satisfy the statute, and avoid sentencing disparity with another case where murder-for-hire was but one of many crimes committed by the defendants.

For example, in the Raymond Chow case, this Court sentenced two individuals, Brandon Jackson and Martin Sullivan, to 54 and 66 months, respectively, for, in part, behavior consistent with murder-for-hire charges. Without knowing all the details the Court considered at sentencing in that case, it is believed these defendants were also involved in other crimes besides murder-for-hire, including drug dealing, and over a longer period. Comparing their criminal lifestyle to Mr. Cazarez's otherwise successful lifestyle, it seems that their behavior is worse by some matter of degree. Therefore, to avoid disparity, Mr. Cazarez should be sentenced to something less.[3]

During the past 18 months in pre-trial custody, Mr. Cazarez has availed himself of virtually every class to improve himself, including DUECE, Anger Management, and Seeking Safety Mental Health Group. He was promoted to Graduate Assistant in the DEUCE and Anger Management Program, and helps with the instruction of other inmates. *See,* Exhibit C. A sentence of 48 months would accomplish the right balance of punishment with a eye to rehabilitation that Mr. Cazarez recognizes he needs.

Finally, as noted in the PSR Sentencing Recommendation, Mr. Cazarez has a "multitude" of mental health issues and a comorbid drug abuse problem. His underlying drug and alcohol issues clearly influenced his bad decision making and criminal behavior. A referral to RDAP is in order.

HALLINAN & WINE

DATED: February 15, 2017        */s/ Kenneth Wine*
Kenneth H. Wine, Esq.
Attorney for Defendant
ULICES CAZAREZ

---

[3]. It could be argued that Messrs. Jackson and Sullivan were actually being controlled by the undercover police, and no one was ever in danger, therefore their murder-for-hire actions were less serious than Mr. Cazarez's. However, what should be punished is the bad acts of the defendant, their *mens rea*, and not whether or not a crime is controlled by the undercover officer.