BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

SCOTT D. JOINER (CABN 223313)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    scott.joiner@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ULICES CAZAREZ, <br><br> Defendant. | NO. CR 15-00362-CRB <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Sentencing Date: March 1, 2017 <br> Time: 1:30 p.m. <br> Judge: Hon. Charles R. Breyer |

# I. INTRODUCTION

The defendant, Ulices Cazarez, stands before the Court to be sentenced following his guilty plea to Count One of the Indictment, Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire, in violation of 18 U.S.C. § 1958. As described below, the defendant's offense is the culmination of an extended pattern of predatory behavior directed at a vulnerable victim. When the victim fought back with legal action, the defendant sought to have her murdered – just days after being served with her complaint for sexual harassment. Prior to that, the defendant repeatedly harassed the victim, a single-mother of two who speaks little English, when he worked as her supervisor at a custodial services company. The victim's and her family's lives have been turned upside down. She lives in constant fear, travels nowhere alone, and has been hospitalized as a result of the trauma suffered after learning of the defendant's plot to have her killed. Her therapist has urged her not to appear in court because of the negative impact it will have on her psychological well-being. Her family rarely leaves the house and, when at home, keeps the curtains closed and a couch pushed against the door. Her teenage son has given up sports and other activities he used to enjoy in order to stay near his mother. Their lives will never be the same.

Against this background, the defendant and probation recommend sentences far below the applicable Sentencing Guidelines range. The government disagrees. Probation recommends 60 months and the defendant recommends 48 months. Neither come close to the applicable Guidelines range of 87-108 months. And neither recommendation will satisfy the goals of sentencing. When weighed against the nature of the crime and the devastating impact on the victim and her family, the defendant's history and conduct do not warrant any downward variance – let alone the significant downward variances described above. To the contrary, the ends of justice and goals of sentencing require a Guidelines-range sentence with substantial incarceration. Given the defendant's sustained efforts to have the victim killed (going so far as to consider doing it himself), his willingness to spend tens of thousands of dollars to do so, and his continuing lack of candor with the Court, the government requests that the Court impose a custodial sentence of 87 months' imprisonment, three years of supervised release, the expanded search condition from the plea agreement, and a mandatory special assessment of $100.

//

UNITED STATES' SENTENCING MEMORANDUM
CR 15-00362 CRB                                                                 1

## II.   OFFENSE CONDUCT (PSR ¶¶ 5-14)

The PSR accurately summarizes the defendant's offense conduct (PSR ¶¶ 7-33), but several aspects bear emphasis here. First, the defendant's text messages (discovered after his arrest) indicate that he began plotting to have the victim killed within days of being served with her complaint for sexual harassment.[1] Second, the same text messages show that his efforts to have the victim killed continued for almost a month and were desperately escalating at the time of his arrest.

The victim's civil complaint for sexual harassment was filed on May 22, 2015, and served on May 23, 2015. *See* Joiner Decl., Ex. B. By June 3, 2015, the defendant began texting another individual to arrange the victim's murder. What followed was a sustained effort over several weeks to bring the murder-for-hire plot to fruition, including a face-to-face meeting on June 12, 2015 with an undercover ATF employee (UCE) posing as a hit-man, and a persistent string of text messages pursuing the murder-for-hire scheme through June 26, 2015. Early in the communications, in the first couple weeks of June, the defendant and the unknown individual discussed people willing to kill the victim for "40" [$40,000] (the defendant said that $40,000 was too expensive). The unknown person said they would not do it for less because "They say it's too risky." Joiner Decl., Ex. A, p. 2, line 62. The two discussed other people willing to kill the victim for cheaper prices and they also discussed contacting the confidential informant (CI) to see if he could find someone – which he did (ultimately connecting the defendant with the UCE).

The defendant's text messages also leave no doubt that he was targeting the victim because of her lawsuit. At one point he texted "The bad thing is the court will take her side embraca my check And a lot more other things." Ex. A, p. 3, line 88. As of June 24, 2015, the defendant was getting increasingly desperate and beseeched the unknown person: "please as soon as possible I need to urgently resolve this as soon as possible." Ex. A, p. 7, line 210. Unhappy with his progress, the defendant also appears to have contemplated murdering the victim himself. On June 26, 2015, the defendant wrote "Do you know anybody that lives in Las Vegas So they can buy me the toy." Ex. A, p. 7, line 218. ("Toy" is

---

[1] A rough translation of the defendant's text messages is attached as Exhibit A to the Declaration of Scott D. Joiner, filed concurrently herewith. These text messages were previously filed with the Court in connection with the government's appeal of the magistrate's ruling on detention (*See* ECF No. 20). Messages shaded in green were sent from the defendant's phone.

UNITED STATES' SENTENCING MEMORANDUM
CR 15-00362 CRB                                            2

a common slang for a firearm.)  The two then discussed people who were willing to do it for "30" [$30,000]. Ex. A, p. 7, lines 221-232.  According to the texts, these individuals did not want to meet with anyone except a trusted associate.  As the unknown individual wrote to the defendant: "The people don't work on contracts.  Just tell them how much and they're [sic] do it.  They are not lawyers to go an talk with."  Ex A., p. 7 line 231.  The unknown person then said that "they only need a picture and the address that's it."  Ex. A, p. 7, line 234.  When the unknown person said that the UCE was cheaper, the defendant replied "Yes but I think they are the police."  Ex. A, p. 7, line 239.  The unknown person then indicated that "if I had this problem, I would do things right and my way."  Ex. A, p. 8, line 250.  Defendant asked if the unknown person would go with the defendant to Las Vegas "To purchase what I need."  Ex. A, p. 8, line 251-254.  When the unknown person asked why the defendant would need such a thing, the defendant replied: "so nothing is heard when I do that."  The two went on to discuss certain things leaving traces for law enforcement, having to provide information to get it, getting rid of it afterward, and leaving a casing – all of which indicates discussion of a firearm.  Ex. A, p. 8, lines 267.  At the same time, the defendant confirmed that he was willing to spend $21,000 to have the victim murdered, writing: "Tell the persons if they'll do it for 21 we have a contract."  Ex. A, page 8, line 268.  These last communications occurred on June 25 and 26, 2015.  The defendant was arrested on June 26, 2015.

### III.   CANDOR WITH THE COURT

The government notes that the defendant previously lied to pretrial services and the Court in connection with his pretrial detention.  His prior lack of candor is now significant with regard to his sentencing because it appears that the defendant has been dishonest with U.S. Probation during the preparation of the PSR.

After his initial appearance in magistrate court, the defendant told U.S. Pretrial Services that his passport had been stolen.  This claim later proved to be false.  In addition, at the hearing on pretrial detention before the District Court on July 10, 2015, the defendant claimed that he was not aware that he traveled to Cuba during the year.  This was significant given the defendant's failure to disclose to the Pretrial Services Officer that he had traveled to Cuba when describing other international travel during the same period.  After inspecting the defendant's cellular telephone, the government discovered

photographs that depicted the defendant's phone in Cuba during the time that the defendant said he traveled to Mexico and to the Dominican Republic. More specifically, metadata for the photographs showed GPS coordinates indicating that the defendant took photographs in Cuba on March 6, 2015. (ECF No. 20.) At least one of the photographs was recognizable as a government building in Cuba. (*Id.*)

In the PSR, the defendant now describes a dramatic confrontation with the victim at an ice cream store. (PSR ¶ 16.) He claims that it was this episode that led to an alcohol and drug-fueled binge. During this binge, the defendant claims he texted prolifically in an attempt to hire someone to kill the victim. The victim flatly denies any such ice-cream-store encounter ever occurred. Because the defendant's recent explanation is suspicious on its face, and contradicted by the victim, the government believes it would be proper for the Court to take into account the defendant's previous (and continuing) lack of candor in determining an appropriate sentence.

## IV.   SENTENCING GUIDELINES CALCLATIONS

The government concurs with the PSR's Guidelines calculation which results in a total offense level of 29. The government also agrees that the defendant's prior convictions result in a Criminal History Category (CHC) of I.

## V.   DISCUSSION

### A.   Applicable Law

In the present case, 87 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Section 3553(a) directs the Court to consider a number of factors in determining an appropriate sentence. In addition to the "nature and circumstances of the offense and the characteristics of the defendant," the key factors also include "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment…" 18 U.S.C. § 3553(a)(1), (2). All of these factors weigh in favor of a Guidelines-range sentence here.

Although the Supreme Court's decision in *Booker* rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing. *Kimbrough v. United States*, 552 U.S. 85, 108, (2007) (internal quotation marks and citation omitted); *see Carty*, 520

F.3d at 991 (en banc); *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011).  While there is no presumption of reasonableness for a Guidelines range sentence, if a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Carty*, 520 F.3d at 991-992 (citing *Gall v. United States*, 552 U.S. 38, 50, (2007)); *see also United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence.").  As the Supreme Court recognized in *Gall*, "a major departure should be supported by a more significant justification than a minor one."  552 U.S. at 50.  Finally, "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing."  *United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

### B. Sentencing the Defendant to 87 Months' Imprisonment Would Vindicate the Interests Set Forth in 18 U.S.C. § 3553(a).

Sentencing the defendant to 87 months' imprisonment would vindicate the interests set forth in 18 U.S.C. § 3553(a).  Ulices Cazarez never gave a second thought to his victim.  She was simply an object.  Later – after asserting her rights in court – she became an obstacle.  Something to be eliminated.  It is also remarkable that during his interview with Probation, when given the opportunity to apologize for destroying the victim's life, the Probation Officer was struck by the fact that "the defendant appeared to have given no thought to his victim."  PSR ¶ 17.  Rather than accept responsibility, the defendant has now fabricated an alleged confrontation at an ice cream store which he blames for weeks of uncontrolled alcohol and drug abuse.  It was this ice-cream-store incident, he says, which led to repeated attempts to have the victim murdered.  The facts tell a different story.

The facts show that the defendant began plotting to have the victim murdered within days of being served with her complaint for sexual harassment.  His efforts were not the short term result of a drug and alcohol induced fantasy or binge.  The defendant persisted for weeks – almost a month, in fact – before he was arrested.  Far from a random uncontrolled act, the defendant's communications indicate that he remained deadly serious throughout.  His efforts to arrange the murder of the victim were

UNITED STATES' SENTENCING MEMORANDUM
CR 15-00362 CRB                                                5

persistent, escalating, and stopped just in time by law enforcement. These facts alone should warrant a Guidelines range sentence.[2] But additional factors also underscore the need for a Guidelines-range term of imprisonment.

### C. The Impact on the Victim and Her Family Warrants a Substantial Custodial Sentence.

In considering a just punishment that adequately reflects the seriousness of the crime, it is imperative for the Court to weigh the impact to the victim and her family.[3] As she writes in her victim impact statement ("VIS"), and as stated in the civil complaint, the defendant preyed on the victim as a single mother who spoke almost no English. As her supervisor, the defendant "wanted to take advantage of my situation as a single mother to sexually harass me and to obligate me to go out with him and if I did not accept, he would make sure that I lost my job, in turn impacting my personal life and my children's." VIS at 1. She also explains that the defendant would "follow me and spy on me while I worked, he would invite me to go out with him, he would go into the women bathroom unexpectedly and would get really close to me and breathe sexually into my ear, he would ask me if I was married, he would interrupt my meal breaks when he would sit close to me and look at photos of naked women on his phone, he would take pictures of me when I would bend over, he insinuated to me that I should send him naked pictures of me in a wig and a provocative costume, he would tell me that he could only get an erection with just thinking about me and not with another woman at work. When he realized that I would not go out with him or accept his harassment, he began to retaliate…" *Id.* She goes on to describe how "he would tell me that I was not doing my job well and that I would lose my job, he made dirty places I had just cleaned and take pictures to supposedly document that I was not doing my job and

---

[2] The present case is also easily distinguished from recent murder-for-hire cases cited by the defendant. In those cases, the risk was far different. The target in was not a civilian. To the contrary, law enforcement was controlling the entire scenario and there was never any material risk that an innocent civilian would be killed. In this case there was a direct threat to a civilian and, in fact, law enforcement was forced to make the arrest on an expedited basis because of the concern over imminent harm. The text messages recovered after the defendant's arrest show that law enforcement's concerns were well-founded.

[3] The government understands that the victim will not address the Court in person because, for her mental and emotional well-being, her psychotherapist has advised her against appearing in Court with the defendant. In place of a personal appearance, the government anticipates providing a videotaped statement and translated transcript to the Court and defense.

UNITED STATES' SENTENCING MEMORANDUM
CR 15-00362 CRB                                                6

send them to management, he would yell at me, 'fucking bitch', 'pig', and 'fucking lazy'." *Id.* Her efforts to seek redress from her employer, however, were met with skepticism and undermined by the defendant – who used her lack of English proficiency against her. *See* Joiner Decl., Ex. B

The victim now lives in constant fear, travels nowhere alone, and has been hospitalized as a result of the trauma suffered after learning of the defendant's plot to have her killed. *Id.* at 3. She believes that her fear will persist for the rest of her life. Her therapist has urged her not to appear in court because of the negative impact it will have on her psychological well-being. *Id.* at 2. Her family has not been spared. They rarely leave the house and, when at home, keep the curtains closed and a couch pushed against the door. *Id.* at 3 (writing that her children "do not go out and do not want to open the curtains."). Her teenage son has given up sports and other activities he used to enjoy in order to be by her side. *Id.* at 3-4. Because of the defendant, their lives will never be the same again.

On these facts, the below-Guidelines sentences recommended by the defendant and Probation would be a disservice to the victim and her family. The defendant may not have given the victim a second thought, but it is apparent that he will forever cast a shadow on her and her children. His persistent sexual harassment and escalating efforts to murder the victim will undoubtedly continue to traumatize them for years to come. The Court's should instead impose a Guidelines-range sentence that accurately reflect the serious nature of the offense and the wide-ranging impact to the victim.

## VI.   CONCLUSION

The government therefore requests that the Court sentence the defendant to 87 months in prison, three years of supervised release, the search condition set forth in the plea agreement, and a $100 special assessment.

DATED: February 22, 2017

Respectfully submitted,
BRIAN J. STRETCH
United States Attorney

_____/s/_____
SCOTT D. JOINER
Assistant United States Attorney

UNITED STATES' SENTENCING MEMORANDUM
CR 15-00362 CRB                                   7